## CIRCUIT COURT OF BALTIMORE CITY.

Decided December 27, 1897.

EX PARTE R. KEMP PAYNE.

*John V. L. Findlay* and *John F. Preston* for petitioner.

*Niles & Wolff* for committee.

STOCKBRIDGE, J.—

This case involves but a narrow question, namely, the present sanity of R. Kemp Payne. After a confinement beginning in March, 1894, and continuing with but a brief interval to December, 1895, he was, after hearing before a sheriff's jury, found insane, the finding of the jury ratified, and a committee appointed of both his person and estate; but though thereafter confined, he has since the adjudication of insanity not been in any asylum or hospital, and for much of the time under only nominal surveillance, and since February of the present year practically without any surveillance whatever.

The petition now asks an adjudication by the Court that he has recovered from the insanity of which he was found to be suffering by the verdict of the jury, and that upon such finding his committee be discharged and he be restored to the control of his property and estate. Voluminous testimony has been taken both in support of the petition and upon the part of the committee, testimony which involves many apparent contradictions, testimony which abounds in medical opinions and theories. It is impossible within any proper limits for an opinion of the Court to review this testimony in detail. Generalizations are all that can now be dealt with.

Upon the part of the petitioner there is offered the testimony of a number of witnesses, not medical men, but persons who have come more or less frequently in contact with the petitioner, at times since the verdict of the jury, in ,which these witnesses testify substantially that they have never observed in him anything which they would regard as the indications of an insane man.

The greater part of the testimony on behalf of the committee is that of physicians, experts in mental diseases, who testify with no less positiveness to the present insanity of Mr. Payne. Each of these classes of witnesses, however, has manifestly a different standard by which they measure the sanity or insanity of an individual, and for that reason it is impossible to weigh the testimony of the one as against that of the other. It has been urged with great force by the counsel for the committee, that upon a question of this character, non-experts are not entitled to give any opinion as to the mental soundness or unsoundness of the individual in question, unless such opinion be accompanied by a statement of the facts or series of facts, upon which such opinion is based, and that in such cases the Court will consider the facts testified to as forming the basis of an opinion as to the measure of the value of or credence to be placed upon such opinion. This proposition is correct, and measured by this standard the facts as detailed by the witnesses for the petitioner are, many of them, of such fragmentary character, as to greatly weaken the confidence to be placed in the opinions expressed by these lay witnesses.

When now we come to consider the opinion of the medical experts, we are dealing with a class of witnesses which has been held by the highest Courts of our country, to be entitled to express an opinion, without regard to the particular facts upon which it is based, and yet with regard to these witnesses, the Court in dealing fairly with the question ought also to measure their opinion by the established facts of a case, for such established facts may upon the one hand bring that opinion to a point of absolute certainty, or may on the other hand, materially diminish its value. A number of the experts who have been examined under this petition, were also experts who testified before the jury by which Mr. Payne was found insane. Their testimony as given at that time was substantially as follows: That Mr. Payne was suffering from a form of insanity technically known as "paranoia"; that paranoia is an incurable disease; that though it might have periods of remission, that is periods in which the supposed lunatic suffered less from his ailments, yet such periods were not recovery, and that the disease was a progressive one, that is a disease which goes from bad to worse. In examining the facts of the case, we find the following condition: that whereas for the eighteen months preceding the finding of the jury Mr. Payne has been in confinement, had refused to partake of food, so that it had to be administered to him with mechanical appliances, had been the victim of hallucinations and delusions—since the verdict of that jury he has not been in confinement, and has been for at least half of the time practically without surveillance, and he is today in a better condition mentally and physically than he was at the time of the trial.

The prognosis, therefore, as given before the jury. has not been verified. The period since the adjudication, if it be one of insanity rather than recovery, has been one of unusual length; there has been no progression from bad to worse, but whatever change has taken place, has been for the better, to the admitted surprise of an expert like Dr. Hill. With all due and proper respect, therefore, for the opinion of the learned gentlemen who have devoted their lives to the study of this most unfortunate class of human ailments, the facts, as presented in this case, fully accord with their theories.

The Court is not now concerned with the question of whether at the time of the finding of the verdict by the jury, Mr. Payne was sane or insane; the fact was concluded when that jury rendered its verdict, and its finding was approved by this Court.

The sole question, now, is one of recovery. The standard by which this recovery is to be measured or tested, however, is not entirely free from difficulty. The indicia or symptoms of the mental aberration which were present in December, 1895, and were then positively testified to, were delusions and hallucinations of one character or another, and they were delusions and hallucinations which continued down to and were manifestly in existence at the time when the hearing before the jury was had, as is evidenced by the fact that during that hearing Mr. Payne brought into Court from the Sheppard Asylum food, supposedly for the purpose of its exhibition to the jury to show them its character. These delusions and hallucinations, it is now claimed by the committee, still exist, but with regard to them there is a great and important difference to be noted. The delusions and hallucinations, either or both, as testified to in the evidence taken under the present petition, whether it be the testimony of the medical experts, or the testimony of the lay witnesses, like Lankford, relate not to the present time or immediate surroundings of the petitioner, but they are hallucinations or delusions of the past, for the most part with regard to the matters occuring when Mr. Payne was in confinement, his treatment at the hospital, or matters occurring before the time of such confinement. His letters filed in evidence, and the one especially relied upon by the counsel for the Committee, dated in August, 1896, before the filing of this petition, is remarkable by contrast with the earlier condition of Mr. Payne, in that, it deals not with the surroundings of Mr. Payne or his suspicions at the time when the letter was written, but related back to the period of his confinement in the "Nunnery" as he termed it, thereby meaning the hospital. This presents a condition not in accord with the symptoms of paranoia, either as defined by eminent physicians called as witnesses in this case, or as enumerated

in the text-books cited upon the learned counsel upon either side, with the single exception of Clouston, who says upon page 171: "A recovered patient's belief in the reality of his former delusions is not at all uncommon."

If then recovery from mental diseases may be complete, though there still remains a recollection, and a clear and distinct recollection of former delusions, whether as a reality or as a dream, it would seem to follow that the present case of Mr. Payne, and his remembrance of his former delusions as evidenced in the letter to Mr. Jones, as evidenced in his interview with Mr. Lankford and other of the witnesses, is in no manner inconsistent with the idea of his recovery.

It has been suggested that present or continuing delusions of suspicion, are evidenced by Mr. Payne's entertaining doubts with regard to his counsel and changing them; but if every individual who becomes dissatisfied during the progress of a case with his counsel, and proceeds to change them for one reason or another, is to be deemed insane, it opens a new and different and larger field for an adjudication of insanity, than I am as yet prepared to recognize.

The facts as already noted differentiate the case under consideration from the symptoms of paranoia as detailed by the medical experts, and if their assumption be correct that paranoia is incurable and is progressive, then it would seem to follow, that the affection from which Mr. Payne suffered could not have been, and cannot today be, a case of paranoia at all, much less what some of the witnesses are pleased to style "a typical case."

Mental aberration may appear in an almost indefinite variety of forms, ranging from the raving maniac, whom chains alone will suffice to restrain from self-destruction, or the destruction of others, down through all the lesser degrees of insanity, mono-mania and idiocy, to forms where its presence would not be suspected or imputed, except by the most experienced specialist, and where even such any one would say that the case under consideration was so close upon the border line which divides the sane from the insane, that it would be difficult to determine to which class the particular individual should be properly assigned. In this infinite variety it is not every degree of mental aberration which will warrant a Court in placing the property of the individual in the charge, and his person under the surveillance of a committee. Such a step can be sanctioned only in cases where such a course is manifestly necessary for the protection of the dement from himself, or the protection of others from him, or the preservation of the property of one so afflicted from his own unreasoning and uncontrollable dissipation of it. Were any different rule to be followed by our Courts, then every crank would become a subject of chancery guardianship; nearly every man today characterized as a genius, and many of the most advanced thinkers and workers in the world's work, would become the wards of chancery. The proper function of Courts is, as before stated, to interfere and take the guardianship of the person and the supervision of the estate, only in cases where it is necessary for the protection of the individual from himself or the community against him. It is not enough that there is a possibility that he may at some indefinite time, more or less remote, develop a dangerous tendency, when, if the medical theories are correct, there is more than an even chance, that, even assuming him to be a paranoiac, that he will develop such tendencies.

Science today recognizes much in heredity, especially in the direction of inherited criminal tendencies, but there is no justification in law because a child has criminal parents, and is therefore in the scientific view predisposed to criminal tendencies, to forthwith incarcerate such child, because he may hereafter become a criminal and transgress the laws of the land; and for like reason in the case of a mental aberration, the mere possibility that that aberration may develop into conditions where the subject would become dangerous, either to himself or others is not sufficient, there must at least be a strong probability that he will so develop it. When now we bear this principle in mind and examine the acts of Kemp Payne, there is nothing to indicate a dangerous tendency either to himself or to others. The one fact trenuously relied upon by the Committee, an occurrence in the fall of 1896, does not bear this out; situated as he was at that time, had he been possessed of a suicidal mania or dis-

position, nothing would have been easier than for him to have ratified it, while as regards others, his own declaration, as testified to, was that he would not hurt the person addressed, and ingenious though the argument be, that such a declaration should be construed to mean that he would do violence to others, it is too remote and not sufficiently supported by the facts, to warrant the Court in its adoption. But it is urged in a case like the one at Bar, before the Court can grant the prayer of the petition, there must be not evidence merely, but *strong* evidence of the recovery, and that this is negatived by the positive testimony of the vast majority of medical experts who have testified in this case. It is perfectly true that the evidence of recovery should be strong evidence, and it is equally true that the medical specialists have testified with absolute certainty that the recovery has not taken place, but as has before been observed, it is also testified to by these same medical experts that there has been a vast improvement in the condition of Mr. Payne from what it was eighteen months ago, and it has taken place directly contrary to their prognosis. What the medical experts may mean by the term "recovery" is not perhaps entirely clear. If by recovery is meant that Mr. Payne is in all respects today a normal man, then it would seem that that testimony is correct; but there is no evidence that Mr. Payne ever was at any time in his life of full, normal mentality, and so long as he measures, not to the standard of the normal mental average, but to the standard of his own normal mental condition, or approximately thereto, and comes within the conditions before laid down of being possessed of self-control, not dangerous to himself or to the community, he must for legal purposes be deemed to have recovered, and to be entitled to be restored to his property and have the committee discharged.

While entertaining the highest respect for the opinions expressed by the alienists in the case, I can not, in view of all the conditions which surround it, come to any other or different conclusion, than that Mr. Payne has so far recovered that he is entitled to be restored to the control of his person and property, free from the surveillance of the committee.

With regard to the costs in the case, it has been urged that they should be imposed upon the committee, because of the position taken in opposition to the granting of the present petition. I do not agree with this view, for the reason that as a measure of protection to the community, whenever an application of this character is presented, it is proper that the Court should be fully apprised by the best testimony attainable, as to the exact condition of the alleged lunatic, and of the possibilities as opposed thereto, and this is an expense which I think it proper should be defrayed out of the estate of the one who has been or is a lunatic.